**LYNCH CARPENTER, LLP**
(Eddie) Jae K. Kim (SBN 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN 312239)
tiffine@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Telephone: (619) 762-1910
Fax: (619) 756-6991

Nicholas A. Colella (*pro hac vice* forthcoming)
nickc@lcllp.com
1133 Penn Ave, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
Fax: (412) 231-0246

*Attorneys for Plaintiff and Proposed Class Counsel*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

FRANCIS PEIRCE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

CALLAWAY GOLF COMPANY,

Defendant.

Case No.: '26CV6165 AGS AHG

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Francis Peirce ("Plaintiff"), individually and on behalf of all others similarly situated, hereby files this class action complaint against Defendant Callaway Golf Company ("Callaway" or "Defendant"), and in support thereof alleges the following:

**NATURE OF THE ACTION**

1. This is a class action brought against Defendant for the wiretapping of electronic communications of visitors to Defendant's website, www.callawaygolf.com ("Website"), and all of the Website's subpages.

2. Defendant procures multiple third-party vendors (collectively, "Code Vendors") to embed snippets of JavaScript computer code (the "Code") on the Website, which then deploys on each Website visitor's internet browser for the purpose of intercepting and recording the Website visitor's electronic communications with the Website. The Code intercepts Website visitors' page views, URLs of web pages visited, browser information, IP address, demographic information of the website visitor, form submissions entered into text fields, and/or other electronic communications in real-time (collectively, "Website Communications").

3. The Code procured by Defendant surreptitiously and instantaneously intercepted, stored, and recorded everything Plaintiff and the Class Members (defined below) did on the Website, *e.g.*, what they searched for, what they looked at, the information they input, and what they clicked on for the entire duration of their visit. The Code does this on a continuous basis during a website visitor's visit.

4. The Code Vendors create and deploy the Code at Defendant's request, and the Code captures and stores the Website Communications of each Website visitor.

5. Defendant offers the ability for Website visitors to configure their privacy preferences, purportedly preventing third parties from capturing Website Communications. However, even after a Website user turns off the Code, explicitly rejecting the tracking of Website Communications, Defendant still allows the Code Vendors to capture all Website visitor's Website Communications without their consent.

6. Defendant knowingly, willfully, and intentionally procured the interception of, and used, the electronic communications at issue without the knowledge or prior consent (or, in some cases, against their direct rejection of consent) of Plaintiff or the Class Members. Defendant did so for its own financial gain and in violation of Plaintiff's and the Class Members' substantive legal privacy rights under state wiretapping laws and common law.

7. Plaintiff brings this action individually and on behalf of a Class of all Pennsylvania citizens whose Website Communications were intercepted through the use of the Code embedded on Defendant's Website. Plaintiff seeks all civil remedies provided

under the causes of action, including but not limited to compensatory, statutory, and/or punitive damages, declaratory and injunctive relief, and attorneys' fees and costs.

**PARTIES**

8. Plaintiff Francis Peirce is, and was at all relevant times, a resident and citizen of the Commonwealth of Pennsylvania.

9. Defendant Callaway Golf Company is a leading golf equipment, gear, and apparel company incorporated in Delaware, with its principal place of business in Carlsbad, California.

10. Defendant owns, manages, and operates the Website www.callawaygolf.com and its subpages.

**JURISDICTION AND VENUE**

11. The Court has personal jurisdiction over the Defendant because Callaway is headquartered in the Southern District of California and does business in this District.

12. The Court has subject matter jurisdiction over the action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453, 1711–1715. Under § 1332(d)(2), the amount in controversy exceeds $5 million and at least one member of the proposed Class is a citizen of a state other than Delaware and California.

13. Venue is proper in the United States District Court for the Southern District of California under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District and is subject to the personal jurisdiction of this Court.

**Factual Allegations**

**How the Code Intercepts Website Communications**

14. Defendant contracts with at least three different Code Vendors, including, *inter alia*, TikTok, Meta Platforms, Inc. ("Meta"), and LinkedIn, to deploy the Code in its Website.

**TikTok**

15. TikTok has more than 750 million monthly users worldwide and is one of the top five largest social media companies. TikTok's main source of revenue is selling ads, with reports showing that TikTok's ad revenue exceeds $12 billion.

16. TikTok's parent company reports similar growth with its advertising revenue increasing year to year, jumping from just $7.3 billion in 2018 to $38.6 billion by 2021.

17. To increase its advertising revenue, TikTok offers tracking and analytics services, including the TikTok Pixel. More than a million websites, including Defendant's Website, incorporate the TikTok Pixel.

18. The TikTok Pixel is a piece of HTML code placed on a website that tracks users' interactions, including what pages they view, buttons they click on, and information they enter, along with a unique identifier.

19. The TikTok Pixel intercepts these communications immediately after they are sent and before they are received by the website operator.

20. In addition, the TikTok Pixel collects identifiable information such as the users' IP address, the device's make, model, and operating system, browser information, a unique session ID, and first- and third-party cookie data that can be associated with a specific user.

21. TikTok uses the cookies it collects and/or its "Advanced Matching" feature to "recognize and learn about people from [the] website and the types of actions they do or don't take." In April 2022, TikTok made its collection of first- and third-party cookies automatic across all websites that incorporated the TikTok Pixel prior to March 10, 2022.

22. Once the TikTok Pixel intercepts this data, it is sent to TikTok's server, where it is stored and processed. The data collected by TikTok is then used to match website actions to individuals, as well as provide attribution reports and track users. Further, if the user has a TikTok account, the data is used in connection with TikTok's advertising services.

23. Defendant installed the TikTok Pixel on the Website:




*Screenshot demonstrating that the TikTok software is installed on Defendant's Website. Screenshot taken after turning off tracking.*

24. Through this technology, TikTok intercepted Defendant's Website users' communications. As a result, the substantive information Plaintiff intended to provide to Defendant was intercepted by TikTok.

25. Plaintiff did not consent to the interception of his data by TikTok. To the contrary, as alleged below, Plaintiff rejected all tracking when Defendant presented him with the option. TikTok's nonconsensual interception of Plaintiff's data that resulted from Defendant's conduct constitutes an invasion of privacy and violates Pennsylvania law.

**Meta (Facebook)**

26. Meta offers the Meta Pixel for website owners to "track website activity and optimize [their] advertising performance." [1]

27. The Meta Pixel is a snippet of JavaScript code which collects detailed and granular data from visitors' interactions with a webpage.

28. The Meta Pixel works by placing and triggering cookies on visitors' web browsers. These cookies allow Meta to match website users to Facebook and Instagram accounts.

29. Once a third-party company, advertiser, or other entity sets up Meta Pixel on a website, Meta begins matching visitors to unique Facebook and Instagram accounts and intercepting their communications with the website.

30. Importantly, Meta designed Meta Pixel such that Meta receives website visitors' communications with a webpage contemporaneously. This means that as soon as a website visitor takes any action on a webpage that has embedded the Meta Pixel, Meta intercepts the user's communications with the webpage while they are occurring.

31. The Meta Pixel allows businesses to create a library of website visitors' actions. These tracked events are then stored so that Meta can analyze the data collected.

32. The data is delivered to Meta with unique user information, including the user's device make, model, and operating system, browser information, a unique session ID, and first- and third-party cookie data that can be associated with a specific user.

[1] *Meta Pixel*, Meta, https://www.facebook.com/business/tools/meta-pixel/ (last visited Oct. 28, 2026).

33. If a person is logged in to Facebook or Instagram when they visit a website where the Meta Pixel is embedded, Meta can link this data to specific Facebook and Instagram accounts. Meta then uses the data to analyze website visitors' behavior and send customized ads to their Facebook and Instagram accounts.

34. If a person is not logged in to Facebook or Instagram when they visit the website, Meta uses personal information that a user enters in form fields to match them to their Facebook and/or Instagram profile through a process called Advanced Matching. With this process, Meta collects emails, first and last names, phone numbers, birthdates, and addresses, then uses that information to connect event tracking data to a specific Facebook or Instagram profile.

35. Defendant installed the Meta Pixel on the Website:




*Screenshot of the Meta Pixel Running on Defendant's Website after a User Rejects Cookies*

36. Through Meta Pixel, Meta intercepted the communications of visitors to Defendant's Website. As a result, communications intended only for Defendant were captured by Meta without users' knowledge or consent.

37. Plaintiff did not consent to the interception of his data by Meta. To the contrary, as alleged herein, Plaintiff rejected cookies when Defendant presented him with the option. This nonconsensual interception of Plaintiff's data that resulted from Defendant's conduct constitutes an invasion of privacy and violates Pennsylvania law.

**LinkedIn**

38. "The LinkedIn Insight Tag is a snippet of JavaScript code that loads a small library of functions you can use to track LinkedIn ad-driven visitor activity on your

website. It relies on LinkedIn cookies, which enable us to match your website visitors to their respective LinkedIn member accounts.”[2]

39. “By default, the Insight JavaScript Tag will track visits to your website, including the URL, buttons clicked, referrer, IP address, device and browser characteristics (User Agent), and timestamp.”[3]

40. “The LinkedIn Insight Tag takes advantage of JavaScript as it’s a lightweight way to track conversions. Your website experiences no latency and it’s easy to track both overall website usage as well as specific events.”[4]

41. LinkedIn even boasts how it can still capture content from users who wish to remain private by blocking cookies while browsing: “Some browsers have already started blocking 3rd party cookie tracking by default (including Safari, Firefox), and others (such as Chrome) announced plans to do so in the near future. It’s important for advertisers to prepare for these changes by switching to JavaScript tags and enabling ‘enhanced conversion tracking’ in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.”[5]

42. LinkedIn is able to capture Website Communications that website visitors believe are private.

43. Defendant has the LinkedIn Insight Tag installed on its Website:




*Screenshot of LinkedIn Software Running on Defendant’s Website after a User Rejects Cookies*

---

[2] *Insight Tag*, LinkedIn, https://business.linkedin.com/marketing-solutions/insight-tag (last visited Oct. 28, 2026).

[3] *Id.*

[4] *Id.*

[5] *Id.*

44. Even if the website visitor wanted to remain anonymous, LinkedIn will "match your website visitors to their respective LinkedIn member accounts" for easy targeting.

45. The extent and detail of the data collected by LinkedIn for users of the technology, such as Defendant, far exceeds the stated purpose and Plaintiff's and the Class Members' reasonable expectations when visiting Defendant's Website. Indeed, in a patent dispute, a highly utilized Code provider openly admitted that this type of technology is utilized by companies like Defendant to make a profit: "[the] software computes billions of touch and mouse movements and transforms this knowledge into profitable actions that increase engagement, reduce operational costs, and maximize conversion rates (i.e., the percentage of users who take desired actions on a website, such as purchasing a product offered for sale)."

46. Plaintiff did not consent to the interception of his data by LinkedIn. LinkedIn's nonconsensual interception of Plaintiff's data that resulted from Defendant's conduct constitutes an invasion of privacy and violates Pennsylvania law.

**Website Users Have a Reasonable Expectation of Privacy in their Interactions with Defendant's Website**

47. Consumers are skeptical and wary about their data being collected. A report released by KPMG shows that "a full 86% of the respondents said they feel a growing concern about data privacy, while 78% expressed fears about the amount of data being collected."[6]

48. Another paper also indicates that most website visitors will assume their detailed interactions with a website will only be used by the website hosts and not be shared with a third-party they know nothing about.[7] As such, website visitors reasonably expect

[6] KPMG, *Privacy Concerns Rise As Businesses Report Increased Personal Data Collection,* PR Newswire (Aug. 17, 2021), https://www.prnewswire.com/news-releases/privacy-concerns-rise-as-businesses-report-increased-personal-data-collection-301356043.html (last visited Oct. 26, 2026).

[7] Joseph Turow et al., *Americans Can't Consent to Companies' Use of Their Data*, 17 Int'l J. Comm. (2023), https://ijoc.org/index.php/ijoc/article/view/21490 (last visited Oct. 26, 2026).

that their interactions with a website should not be released to third parties unless explicitly stated.

49. Privacy polls and studies show that a majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.[8]

50. A recent study by Consumer Reports shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believe internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[9]

51. Moreover, according to a study by Pew Research Center, a significant majority of Americans, approximately 79%, are concerned about how data is collected about them by companies.[10]

52. Users act consistently with their expectation of privacy. Following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[11]

[8] Ipsos, *Most Americans Say It Is Increasingly Difficult to Control Who Can Access Their Online Data* (Jan. 7, 2022), https://www.ipsos.com/en-us/news-polls/data-privacy-2022 (last visited Oct. 26, 2026).

[9] Scott Medintz, *Americans Want Much More Online Privacy Protection Than They're Getting* (Nov. 20, 2024), https://www.consumerreports.org/electronics/privacy/americans-want-much-more-online-privacy-protection-a9058928306 (last visited Oct. 26, 2026).

[10] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information* (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information (last visited Oct. 26, 2026).

[11] Donovan Erskine, *iOS 14.5 App Tracking Transparency Opt-In Rates* (May 2021), as reported in Shacknews, *Roughly 95% of US Apple Users Opted Out of App Tracking in iOS 14.5* (May 10, 2021, 10:00 AM), https://www.shacknews.com/article/124278/roughly-95-of-us-apple-users-opted-out-of-app-tracking-in-ios-145 (last visited Oct. 26, 2026).

53. Defendant's Website purports to provide users with the opportunity to decline the third-party tracking described above. When a Website visitor visits the Website, Defendant displays a pop-up box telling users that they can "Manage Cookie Preferences."




54. Upon clicking "Manage Cookie Preferences," a Website visitor can "opt out." Callaway tells visitors that they will "Not Sell or Share [visitors] Personal Information For Targeted Advertising."



55. Defendant thus promises Website users that by Opting Out Callaway will not sell or share visitors' information (including by social media companies). Defendant is aware when Website visitor's expressly "Opt Out" of these optional cookies.

56. Website users who opt out of these cookies are telling Defendant, unequivocally, that they ***do not consent*** to their Website Communications being captured by third parties. These users have a clear and objectively reasonable expectation that their data will not be collected, disclosed, used, or analyzed in any way—let alone by unknown third parties.

57. However, Defendant does not honor their Website users' preferences. Instead, Defendant enabled Code Vendors to collect, use, and analyze Website Communications even when users do not indicate their consent, or expressly deny consent, to such tracking.

58. The Code works the same for all Website visitors who chose to continue without accepting cookies.

**Website User and Usage Data Have Immense Economic Value**

59. The "world's most valuable resource is no longer oil, but data."[12]

60. In 2022, Business News Daily reported that some businesses collect personal data (*i.e.*, gender, web browser cookies, IP addresses, and device IDs), engagement data (*i.e.*, how consumers interact with a business's website, applications, and emails), behavioral data (*i.e.*, customers' purchase histories and product usage information), and attitudinal data (*i.e.*, data on consumer satisfaction) from consumers.[13] This information is valuable to companies because they can use this data to improve customer experiences, refine their marketing strategies, capture data to sell it, and even to secure more sensitive consumer data.[14]

---

[12] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), at https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[13] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 25, 2022), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html.

[14] *Id*.

61. In a consumer-driven world, the ability to capture and use customer data to shape products, solutions, and the buying experience is critically important to a business's success. Research shows that organizations who "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[15]

62. In 2013, the Organization for Economic Cooperation and Development ("OECD") even published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[16] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[17]

63. OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military are estimated to cost USD 55."[18]

**<u>Plaintiff's and Class Members' Experiences</u>**

64. While in Pennsylvania, Plaintiff visited www.callawaygolf.com and certain of its subpages. Plaintiff chose to opt out of the optional cookies on Defendant's pop-up menu.

65. After rejecting cookies, Plaintiff browsed for different products on the Website and communicated with the Website by using his mouse to hover and click on

---

[15] Brad Brown, *et al*, *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data.

[16] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGIT. ECON. PAPERS, No. 220 (Apr. 2, 2013), https://www.oecd.org/content/dam/oecd/en/publications/reports/2013/04/exploring-the-economics-of-personal-data_g17a228d/5k486qtxldmq-en.pdf.

[17] *Id.* at 25.

[18] *Id.*

certain products and typing content into form fields, including product names into the search bar.

66. Following Plaintiff's visit to the Website, he began receiving advertisements for Callaway on his social media accounts, highlighting items similar to the items Plaintiff browsed on the Website.

67. Upon information and belief, these advertisements were a result of the Code Vendors capturing his information during his Website visit without his consent.

68. The wiretapping by the Code is, and was, ongoing during his visit and intercepts the contents of these communications between Plaintiff and Defendant with instantaneous and continuous transmissions to the Code Vendors.

69. Thus, when Plaintiff visited Defendant's Website, the contents of his communications with the Website were intercepted by the Code, and simultaneously transmitted to the Code Vendors, without his consent.

70. The tracking Code described above operates in the same manner for all putative Class Members.

71. Like Plaintiff, each Class Member visited Defendant's Website with the Code embedded in it, rejected cookies when presented with the option, and the Code intercepted the Class Members' Website Communications with the Website by sending hyper-frequent logs of those communications to the Code Vendors.

72. The Code procured by Defendant is an electronic, mechanical, or other analogous device in that the Code, monitors, collects, and records the content of electronic computer-to-computer communications between Plaintiff's computer and/or mobile device and the computer servers and hardware utilized by Defendant to operate its Website, subsequently interpreting that data to repurpose it for profits.

73. Alternatively, even if the Code itself were not a device, the Code is a software designed to alter the operation of a Website visitor's computer or mobile phone by instructing the hardware components of that physical device to run the processes that

ultimately intercept the visitor's communications and transmit them to the Code Vendors, without the visitor's knowledge.

74. The data collected by the Code identified specific information input and content viewed, and thus revealed personal and sensitive information about website visitors' internet activity and habits. As such, by the very nature of its operation, the Code is a device used to intercept electronic communications.

75. The Website Communications that Defendant solicited the Code Vendors to monitor, collect, and record was content generated through Plaintiff's and Class Members' use, interaction, and communication with Defendant's Website relating to the substance and/or meaning of Plaintiff's and Class Members' communications with the Website, *i.e.*, information inputted by Plaintiff and Class Members, and pages and content clicked on and viewed by Plaintiff and Class Members. This information is "content" and is not merely record information regarding the characteristics of the message that is generated in the course of the communication, nor is it simply information disclosed in the referrer headers. The mere fact that Defendant values this content, and procures third parties to monitor, intercept and record it, confirms these communications are content that convey substance and meaning to Defendant, and, in turn, to the Code Vendors, who receives the intercepted information.

76. Plaintiff reasonably expected that his visit to Defendant's Website would be private and that Defendant would not have procured multiple third-party vendors to track, record, and/or watch Plaintiff as he browsed, interacted with the Website, and searched for products or services, especially given that he expressly rejected the tracking of this information.

**<u>Plaintiff and Class Members Did Not Consent to the Interception of their Electronic Communications</u>**

77. Plaintiff and Class Members did not provide prior consent to Defendant's interception of their Website Communications, nor could they, as the interception begins immediately upon arriving at Defendant's Website.

78. Even worse, Defendant asked Plaintiff and Class Members for consent, but had no intention of disallowing the Code from running when Website visitors chose to continue browsing the Website without allowing optional cookies.

79. When Plaintiff and Class Members chose to continue browsing the Website without allowing optional cookies, Defendant still allowed the Code Vendors to deploy the Code and capture Website Communications.

## CLASS ACTION ALLEGATIONS

80. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action individually and on behalf of a class of similarly situated individuals defined as follows:

> All Pennsylvania citizens who visited www.callawaygolf.com and opted out of cookies while the Code was embedded on www.callawaygolf.com.

81. Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

82. Plaintiff hereby reserves the right to amend or modify the class definition with greater specificity or division after having had an opportunity to conduct discovery. The proposed Class meets the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

83. **Numerosity, Rule 23(a)(1)**: The members of the Class are so numerous that individual joinder of all Class Members is impracticable. The precise number of Class Members and their identities may be obtained from the books and records of Defendant and/or the Code Vendors.

84. **Commonality, Rule 23(a)(2):** This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

a. whether Defendant procures the Code Vendors and other third parties to intercept Defendant's Website visitors' Website Communications;

b. whether Defendant intentionally discloses the intercepted Website Communications of its Website users;

c. whether Defendant acquires the contents of Website users' Website Communications without their consent;

d. whether Defendant's conduct violates Pennsylvania Wiretap Act, 18 Pa. Cons. Stat. § 5701, *et set.*;

e. whether Plaintiff and Class Members are entitled to equitable relief; and

f. whether Plaintiff and Class Members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief.

85. **Typicality, Rule 23(a)(3)**: Plaintiff's claims are typical of the other Class Members' claims because, among other things, all Class Members were comparably injured through the uniform prohibited conduct described above. For instance, Plaintiff and each member of the Class had their communications intercepted in violation of the law and their right to privacy. This uniform injury and the legal theories that underpin recovery make the claims of Plaintiff and the members of the Class typical of one another.

86. **Adequacy of Representation, Rule 23(a)(4)**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigation to remedy privacy violations. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the Class. Furthermore, Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed.

87. **Predominance, Rule 23(b)(3):** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiff and each member of the Class. If Defendants intercepted Plaintiff's and Class Members' Website Communications, then Plaintiff and each Class Member suffered damages by that conduct.

88. **Superiority, Rule 23(b)(3)**: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Class members have little interest in individually controlling a separate action, because most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy absent a class action. To Plaintiff's knowledge, there is no other pending case where Defendants' customers seek to represent a class of individuals impacted based on the conduct alleged in this Complaint. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

89. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

90. Members of the Class are ascertainable. Class Membership is defined using objective criteria, and Class Members may be readily identified through the books and records of Defendants and/or the Code Vendors.

## CAUSES OF ACTION

### COUNT I
### Violation of Pennsylvania Wiretap Act
### 18 Pa. Cons. Stat. § 5701, et seq.

91. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

92. Plaintiff brings this claim individually and on behalf of the Class.

93. The Pennsylvania Wiretap Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

94. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

95. "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

96. "Contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

97. "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

98. "Electronic Communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

99. Defendant is a person for purposes of the Act because it is a corporation.

100. The Code procured by Defendant is a "device" used for the "acquisition of the contents of any wire, electronic, or oral communication" within the meaning of the Act.

101. Plaintiff's and Class Members' intercepted Website Communications constitute the "contents" of "electronic communication[s]" within the meaning of the Act.

102. Defendant intentionally procures and embeds the Code on its Website to spy on, automatically and secretly, and intercepts its Website visitors' electronic interactions communications with Defendant in real time.

103. Plaintiff's and Class Members' electronic communications are intercepted contemporaneously with their transmission.

104. Plaintiff and Class Members did not consent to having their Website Communications wiretapped.

105. Pursuant to 18 Pa. Cons. Stat. 5725(a), Plaintiff and the Class Members seek (1) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

106. Defendant's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class Members any time they visit Defendant's Website with the Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## COUNT II
## Invasion of Privacy – Intrusion Upon Seclusion

107. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

108. Pennsylvania common law recognizes the tort of invasion of privacy. The right to privacy is also embodied in multiple sections of the Pennsylvania constitution.

109. Plaintiff brings this claim individually and on behalf of the Class.

110. Plaintiff and Class Members have an objective, reasonable expectation of privacy in their Website Communications.

111. Plaintiff and Class Members did not consent to, authorize, or know about Defendant's intrusion at the time it occurred. Plaintiff and Class Members never agreed that Defendant could collect or disclose their Website Communications.

112. Plaintiff and Class Members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

113. Defendant intentionally intrudes on Plaintiff's and Class Members' private life, seclusion, or solitude, without consent.

114. Defendant's conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

115. Plaintiff and Class Members were harmed by Defendant's wrongful conduct as Defendant's conduct has caused Plaintiff and the Class outrage, mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications.

116. Defendant's conduct has needlessly harmed Plaintiff and the Class by capturing intimately personal facts and data in the form of their Website Communications. This disclosure and loss of privacy and confidentiality have caused Plaintiff and the Class to experience outrage, mental anguish, emotional distress, worry, fear, and other harms.

117. Additionally, given the monetary value of individual personal information, Defendant deprived Plaintiff and Class Members of the economic value of their interactions with Defendant's Website, without providing proper consideration for Plaintiff's and Class Members' property.

118. Further, Defendant has improperly profited from its invasion of Plaintiff's and Class Members' privacy in its use of their data for its economic value.

119. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, statutory, and/or nominal damages, in an amount to be proven at trial.

120. Defendant's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Class Members any time they visit Defendant's Website with the Code enabled without their consent. Plaintiff and Class Members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment in Plaintiff's and Class Members' favor and against Defendant as follows:

A. Certifying the Class and appointing Plaintiff as the representative of the Class;

B. Appointing Plaintiff's counsel as class counsel;

C. Declaring that Defendant's past conduct was unlawful, as alleged herein;

D. Declaring Defendant's ongoing conduct is unlawful, as alleged herein;

E. Enjoining Defendant from continuing the unlawful practices described herein, and awarding such injunctive and other equitable relief as the Court deems just and proper;

F. Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages in an amount in excess of the arbitration limits, as well as restitution and/or disgorgement of profits unlawfully obtained;

G. Awarding Plaintiff and Class Members pre-judgment and post-judgment interest;

H. Awarding Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses; and

I. Granting such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury of any and all issues in this action so triable as of right.

Dated: October 28, 2026

**LYNCH CARPENTER LLP**

*/s/ (Eddie) Jae K. Kim*
(Eddie) Jae K. Kim (SBN: 236805)
ekim@lcllp.com
Tiffine E. Malamphy (SBN: 312239)
tiffine@lcllp.com
9171 Towne Centre Dr, Ste 180
San Diego, CA 92122
Telephone: (619) 762-1910
Fax: (858) 313-1850

Nicholas A. Colella*
**LYNCH CARPENTER LLP**
1133 Penn Ave., 5th Floor
Pittsburgh PA, 15222
Telephone: (412) 322-9243
NickC@lcllp.com
**pro hac vice forthcoming*

*Attorney for Plaintiff*
*and the Proposed Class*